# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

RICHARD MCMAHON,

        *Plaintiff,*

v.                        **Case No. 5:16cv60-MW/GRJ**

CITY OF PANAMA CITY
BEACH, FLORIDA, ET AL.,

        *Defendants.*

_____/

## ORDER GRANTING PRELIMINARY INJUNCTION

If it looks like a duck, and it walks like a duck, and it quacks like a duck, then it's probably a duck.[1]

So thought Richard McMahon when he saw the Thunder Beach Motorcycle Rally event being held at Frank Brown Park in Panama City Beach, Florida. Thunder Beach, a large gathering of people interested in motorcycles, though organized by a private

---

[1] *See, e.g.*, *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1337 & n. 28 (11th Cir. 1998) (reciting the "time-tested adage" that is the "duck test" and noting the "wide support" it has received from other courts); *Blake v. Unionmutual Stock Life Ins. Co. of Am.*, 906 F.2d 1525, 1530 (11th Cir. 1990); *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 213 (11th Cir. 1991); *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1359 (11th Cir. 2008).

corporation, is free and open to the public and has no barriers limiting or restricting ingress and egress. McMahon saw that the event looked, walked, and quacked like a free event held in a public park, so he figured that he would enjoy the same rights to free speech that he enjoys in a public park.

McMahon is a Christian who chooses to exercise his free speech rights by passing out small pieces of literature called Gospel tracts. But when he began doing so at Thunder Beach, Thunder Beach officials asked him to stop, saying that they did not allow literature distribution at their event. McMahon said he believed it was a public park and he had a right to free speech, but no, they retorted, this was their private event, and he had to abide by their rules.

McMahon, undeterred, contacted the City of Panama City Beach, who owned the park, to see if he could distribute literature at Thunder Beach. After conferring with its attorney, the City told him that no, he could not. The permit that they gave to Thunder Beach, they told him, was for "exclusive use," and that meant that Thunder Beach had the right to kick out whomever it wanted. McMahon asked what would happen if he passed out the literature anyway, and the City said that Thunder Beach could ask him to

2

leave. McMahon asked what would happen if he continued anyway, and the City said that it would send an officer to arrest him for trespass. Not wanting to be arrested, McMahon stopped passing out Gospel tracts.

McMahon now sues the City and its officials, claiming that it violated his right to free speech, and seeks a preliminary injunction allowing him to exercise his rights at Thunder Beach.

After a searching review of the law and the limited record before it, this Court finds that the preliminary injunction must issue. The duck test governs: Thunder Beach looks like a public forum, and so is a public forum, and McMahon retains the rights to free speech that he would possess in any public forum. The words "exclusive use" in the permit agreement do not change this. And in any event, the City cannot grant Thunder Beach officials the unfettered discretion to call in trespass warnings against anyone whose speech it might find disagreeable.

McMahon is thus substantially likely to succeed on his claim of a First Amendment violation. His speech is constitutionally protected, he attempted to speak in a traditional public forum, and the City's threat to arrest him if Thunder Beach were to so request constitutes state action that is not a reasonable time, place, and

manner restriction on his speech. McMahon has also shown irreparable harm, and the balance of equities and the public interest tilt in favor of issuing the injunction.

I

"At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)). In so stating, it is important to note that some of the evidence presented in support of the motion for preliminary injunction may not be properly considered on summary judgment or admissible at trial.

Plaintiff Richard McMahon, a 67-year-old retired man living in Panama City Beach, Florida, is a born-again Christian. ECF No. 3-1 at 1. He seeks out opportunities to share his faith in public. *Id.* at 2. One way he shares his faith is by handing out pieces of literature called Gospel tracts. *Id.* He believes that leafleting through Gospel tracts allows him to easily share his views in detail with large numbers of people. *Id.*

4

Specifically, McMahon wants to share his faith at the Thunder Beach Motorcycle Rally, an event regularly held at the Festival Site of the Frank Brown Park in Panama City Beach, Florida. *Id.* at 2-3.

A

Frank Brown Park is maintained by the City of Panama City Beach Parks & Recreation Department. ECF No. 3-3. The Park contains "[o]ver two hundred acres dedicated to outdoor recreation facilities including playgrounds, picnic areas, freshwater youth fishing lake, green ways and trails, which are open to the public year round." *Id.*



*Frank Brown Park. ECF No. 3-3.*

1

Frank Brown Park includes among its recreational facilities a "22-acre festival site." ECF No. 3-3.

The festival site is a "wide-open grassy area," ECF No. 3-1 at 3, that can be seen in the bottom half of ECF No. 3-2:



*Frank Brown Park, including Festival Site. ECF No. 3-2.*

According to McMahon, the Festival Site is open to the public all year round, including when there are no events occurring. ECF No. 3-1 at 3.

On June 24, 2015, a day when no event was being held, McMahon visited the Festival Site and made a video recording of his experience. ECF No. 3-1 at 9. McMahon noticed several cars parked nearby, soccer goals set up, and a group of children practicing baseball. *Id.*



*Frank Brown Park Festival Site. ECF No. 3-7 at 00:00.*



*Frank Brown Park Festival Site. ECF No. 3-7 at 00:50.*



*Frank Brown Park Festival Site. ECF No. 3-7 at 01:33.*



*Frank Brown Park Festival Site. ECF No. 3-7 at 00:12.*

McMahon spoke with a Parks Department employee who was on site, and asked whether the field was free for anyone to use. ECF No. 3-1 at 9–10. The employee told him that the Festival Site was regularly used by the public for activities, and the public was allowed to walk on and use the Festival Site at any time. *Id.* McMahon later spoke with Park Coordinator Melissa Deese, who

also told him that the general public was welcome to use the Festival Site for casual recreational activities without signing up or paying any fees. *Id.* at 10.

The festival site is enclosed by a small wooden fence with large closed gates, but the fence contains unobstructed, unmarked pedestrian-sized openings. ECF No. 3-7 at 02:24. There do not appear to be signs or other instructions not to use the park. *Id.*



*Frank Brown Park Festival Site. ECF No. 3-7 at 02:24.*

McMahon later returned to the Festival Site on a different day, and observed children and their parents using the Site and people playing soccer on the Site. ECF No. 3-1 at 10.



*Frank Brown Park Festival Site. ECF No. 3-8.*



*Frank Brown Park Festival Site. ECF No. 3-9.*

2

According to City Manager Mario Gisbert, the Festival Site

is designated as a special event site. ECF No. 25-1 at 1.

The Festival Site grounds were improved beginning in early 2001 as part of a public-private partnership agreement between the City and private entities to provide "new and attractive venues for year-round special events of all types and sizes." *Id.* at 2. The City began renting the Festival Site to private organizations through exclusive use contracts beginning in 2003. *Id.* A private citizen later donated additional funds to further improve the grounds to make them suitable for an annual horse show. *Id.*

The City regularly rents the grounds both to itself and private entities for events, some of which are free and open to the public, and some of which are not and require paid admission. *Id.* at 2–3. The special event agreement grants the entity exclusive use of the site during the time of the event. *Id.* at 3, 26–32.



*The City's Frank Brown Park Map. ECF No. 25-7 at 3.*

When the site is not rented, the City allows the Festival Site to be used by the public generally. ECF No. 25-1 at 1.

B

Thunder Beach Productions, Inc., is a for-profit private corporation. ECF No. 25-4 at 1. Thunder Beach Productions hosts two main events each year in Panama City Beach, Florida, called the

14

Thunder Beach Motorcycle Rallies or "Thunder Beach." *Id.*[2] Thunder Beach's business model is to rent venue space, including the festival site, promote its event, then rent out space at its events to vendors who are able to benefit from the large audience that it attracts. ECF No. 25-4 at 1–4. It had more than 150 registered vendors for the Spring 2015 rally. *Id.* at 4. As part of its business model, the event is free and open to the public in order to attract the greatest audience for its vendors. *Id.* at 3.



*Thunder Beach. ECF No. 25-7 at 4.*

---

[2] This Court refers to Thunder Beach Productions, Inc., the Thunder Beach Motorcycle Rallies, the particular Rallies that McMahon attended and hopes to attend in the future, and the trademarked Thunder Beach® name collectively as "Thunder Beach."



*Thunder Beach. ECF No. 25-7 at 9.*

McMahon has, for several years, attempted to pass out Gospel tracts at Thunder Beach. ECF No. 3-1 at 2–3. McMahon states that he passed out literature and spoke with people in wide open areas; he did not block pathways, litter, or encourage littering. *Id.* at 3–4.

McMahon states that he saw other people passing out fliers advertising local bars and night clubs, and that he assumed that literature distribution was permitted at the event. *Id.* at 4. Thunder Beach officials, however, deny that they would permit such

conduct to occur, and claim that they have at times asked club pro-
moters and timeshare vendors not to distribute information at
their event without renting a booth. ECF No. 25-4 at 5; 25-6 at 1–
2. They claim that they do not permit any individuals, except some-
times employees promoting other Thunder Beach events, to dis-
tribute any information to the crowds outside of a booth. *Id.*; ECF
No. 25-5 at 1. They claim that allowing this conduct would subvert
their business model of renting booths to vendors who seek access
to the audience that Thunder Beach has generated. *Id.*

Thunder Beach security guards approached McMahon and
told him that he could not pass out literature. ECF No. 3-1 at 4.
McMahon claims that after he told them that he had a right to do
so, they told him the City allowed them to kick out anyone they
wanted. *Id.* McMahon agreed to leave. *Id.*

## C

In April 2015, McMahon met with City Manager Gisbert to
explain the situation. ECF No. 3-1 at 4–5. Gisbert, according to
McMahon, stated he believed that Thunder Beach could suppress
whatever speech it wanted, but would check with legal counsel. *Id.*
The City Attorney responded that she believed that Thunder
Beach had the right to prohibit distribution of pamphlets. ECF No.

17

3-4. She relied in part on the license agreement between Thunder Beach and the City, which grants Thunder Beach "exclusive use of the Site" during the event. ECF No. 3-10 at 2 § 2(b).

McMahon decided to pass out tracts at Thunder Beach anyway. ECF No. 3-1 at 6. He went to the Thunder Beach Rally on May 1, 2015, and states that he once again saw people handing out fliers advertising bars and nightclubs. *Id.* He began to hand out tracts. *Id.*

A Thunder Beach employee soon told him to stop. *Id.* McMahon asked to speak to a manager and was directed to Thunder Beach Co-owner Karen Biggs. *Id.* at 6–7. Biggs, according to McMahon, told him they could prohibit any expression they wanted, including leafleting, and warned they would kick him out if he did not comply. *Id.* at 7. Biggs claims that she merely told McMahon that Thunder Beach would not allow him to distribute literature if he was not a registered vendor, and never threatened to call the police or have him arrested. ECF No. 25-5 at 1.

Officer Christopher Boyer of the Panama City Police Department soon arrived and also stated that Thunder Beach had the right to prohibit his literature distribution. ECF No. 3-1 at 7–8. The actual discussion was cordial and literature distribution was

18

discussed mostly in the hypothetical. *See PCB Gospel is Free*, YouTube (May 1, 2015), https://www.youtube.com/watch?v= vyqwE2kBSgI&feature=youtu.be.[3] McMahon acquiesced and left. ECF No. 3-1 at 8. McMahon states he later asked Officer Boyer what would happen if he returned and continued distributing literature, and Boyer told him he would be arrested for trespassing. *Id.* McMahon did not want to be arrested, so he did not return. *Id.* Boyer, however, states that he never threatened to arrest him for trespassing, but merely stated that if Thunder Beach actually asked him to leave, and he refused to comply, then he could be arrested for trespassing. ECF No. 25-3 at 2.

Thunder Beach officials vehemently deny that their decision to ask McMahon to stop leafletting had anything to do with his Christian viewpoint. ECF No. 25-4 at 4–5; 25-5 at 1; 25-6 at 1–2. Rather, they point out that many Thunder Beach employees are themselves devout Christians, host on-site Christian religious services, and regularly rent booths to Christian organizations. *Id.* They maintain that McMahon would be welcome to distribute Christian literature from a booth if he chose to rent one. *Id.*

---

[3] Much of the exchange between McMahon and Boyer was captured on video.

D

After informal attempts to resolve the issue with the City were unsuccessful, *see* ECF No. 3-5; 3-6, McMahon filed suit in this Court against the City of Panama City Beach, Florida, Chief of Police Drew Whitman in his official capacity, City Manager Mario Gisbert in his official capacity, and Officer Christopher Boyer individually and in his official capacity. ECF No. 1.[4] He alleged violations of Free Speech (Count I) and Due Process (Count II) pursuant to 42 U.S.C. § 1983.

McMahon has moved for a preliminary injunction, ECF No. 3, to enjoin the City from arresting him for trespass if he passes out literature at the upcoming Spring 2016 Thunder Beach Rally, scheduled to begin on April 27, 2016.

II

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success

---

[4] This Court recognizes that the claims against the City officials in their official capacities are redundant to the claims against the City itself. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly.").

on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quotation omitted).

## III

McMahon attempted to distribute Gospel tracts at Thunder Beach, a free and open-to-the-public event held on public property. Thunder Beach, a private for-profit company, had received an exclusive permit to use the public property for the day. Thunder

Beach told him that could not distribute literature, and if he continued to, it would call the police to arrest him for trespass.[5] The City told him that if asked to do so, it would arrest him for trespass.[6]

McMahon argues that the City's actions chilled his constitutionally protected right to distribute literature at Thunder Beach.

---

[5] There is arguably some factual discrepancy as to the extent to which McMahon was threatened with trespass. McMahon testified that Thunder Beach officials told him that their permit empowered them to prohibit any expression they wanted and told him that they would "kick him out" if he failed to comply. ECF No. 3-1 at 7. However, Thunder Beach Co-owner Karen Biggs denies ever threatening him with trespass, and claims she just told him that Thunder Beach "did not allow" his activities. ECF No. 25-5 at 1. But what if McMahon failed to comply with Thunder Beach's wishes? Thunder Beach could not have its employees forcibly remove McMahon; that would be battery. Its only lawful means of enforcing its stated policy against literature distribution would be to ask McMahon to leave, and then (absent compliance) to ask the police to arrest him for trespass. Even if Thunder Beach did not actually threaten to call the police against McMahon, it made clear its intent to enforce policies that simply could not be enforced without police involvement.

Further, and perhaps more importantly, Thunder Beach is not a defendant and the details of its conduct are not necessarily dispositive of McMahon's claim. What matters is the *City's* conduct, which was to adopt a policy that gave Thunder Beach the discretion to say who is and is not welcome at its event. *See* fn. 6. The City, for its part, basically concedes that its actions, not Thunder Beach's, are what chilled McMahon's speech. ECF No. 26 at 28 n. 14 ("[F]or purposes of this motion . . . the City will assume that Plaintiff stopped engaging in speech due to the City's representation of potential future action.").

[6] *See, e.g.,* ECF No. 25-3 ("I responded that if Thunder Beach asked us (meaning the Police Department) to give him a trespass warning from the property during its event that we could do so . . . that if Thunder Beach asked us to arrest him, that we could do so."). *See also* Part III.C.2.

The City responds that it was merely enforcing the rights of Thunder Beach, who, like any property owner, has the right to exclude others from its property.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. 1. The right to freedom of speech is protected from infringement by state actors by the Fourteenth Amendment. *Snowden v. Town of Bay Harbor Islands, Florida*, 358 F. Supp. 2d 1178, 1189 (S.D. Fla. 2004) (citing *Everson v. Board of Educ.,* 330 U.S. 1, 8 (1947)).

The government does not have a free hand to regulate private speech on government property. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). However, the First Amendment does not guarantee access to property just because it is owned by the government, and it does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011) (citations and quotations omitted). The government, like any private landowner, may preserve the property under its control for the use to which it is lawfully dedicated. *Id.* at 1231 (citations and quotations omitted). The existence of a right of access to public property and the standard by which limitations upon such a right

23

must be evaluated differ depending on the character of the property at issue. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

In order to determine the extent to which a person has a right to free speech on government property, courts engage in a three-step analysis. First, a court must determine whether the speech is protected under the First Amendment. *Parkland Republican Club v. City of Parkland*, 268 F. Supp. 2d 1349, 1352–1353 (S.D. Fla. 2003) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985)).[7] Second, the court must determine the nature of the relevant forum, which in turn determines the extent to which the government may limit access to the forum. *Id.* Third, the court must determine whether the justifications proffered by the government for limiting access to the forum satisfy constitutional standards. *Id.*

---

[7] The City concedes that McMahon's speech is protected under the First Amendment. *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."); *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1181 (11th Cir. 2009) ("[P]assing out leaflets is an activity protected by the First Amendment.").

A

The Supreme Court has broadly discerned three distinct (although not airtight) categories of government property for First Amendment purposes: traditional public fora, designated public fora, and limited public (or nonpublic) fora. *Bloedorn*, 631 F.3d at 1230; *Keeton v. Anderson-Wiley*, 664 F.3d 865, 871 (11th Cir. 2011).

Traditional public fora are public areas such as streets and parks that, since "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Bloedorn,* 631 F.3d at 1231 (quoting *Perry*, 460 U.S. at 45). Thus, a time, place, and manner restriction can be placed on speech in a traditional public forum if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication. *Id.* If a *content-based* restriction is placed, it must survive strict scrutiny; that is, the government must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Perry*, 460 U.S. at 45.

A designated public forum is government property that has not traditionally been regarded as a public forum but that has been intentionally opened up for that purpose. *Bloedorn,* 631 F.3d at

1231. Time, place, and manner restrictions are permissible to the same extent as in traditional public fora. *Id.*

Lastly, a limited public forum (or, alternatively, a nonpublic forum) may be established when the government limits its property to use by certain groups or dedicates it solely to the discussion of certain subjects. *Id.*[8] Any restrictions made on expressive activity in a limited public forum only must be reasonable and viewpoint neutral. *Id.* Put differently, in addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.

---

[8] There does not appear to be a consensus among courts as to whether there is a distinction between a "limited public forum" and a "nonpublic forum." *Compare Bloedorn,* 631 F.3d at 1231 (mentioning "limited public forum") *with Keeton,* 664 F.3d at 872 (mentioning "nonpublic forum"). Justice Thomas recently implied that a nonpublic forum is merely another name for a limited public forum. *See Am. Freedom Def. Initiative v. King Cty., Wash.*, 136 S. Ct. 1022, 1022 (2016) (Thomas, J., dissenting from denial of certiorari). *See also Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011) (noting that distinction is a "change in nomenclature" that "has not changed the governing standard"). Other courts, however, have pointed out some distinction. *See, e.g., Freedom from Religion Found., Inc. v. City of Warren, Mich.*, 873 F. Supp. 2d 850, 860 & n. 3 (E.D. Mich. 2012); *Children First Found., Inc. v. Fiala,* 790 F.3d 328, 339 (2d Cir. 2015) *opinion withdrawn and superseded on reh'g in part,* 611 F. App'x 741 (2d Cir. 2015) (recognizing four types of public fora). Regardless of nomenclature, government regulation of speech on government property that is not a traditional or designated public forum must be reasonable and viewpoint neutral. *Bloedorn,* 631 F.3d at 1231; *Keeton,* 664 F.3d at 872; *Victory Through Jesus,* 640 F.3d at 334; *Fiala,* 790 F.3d at 339–340.

*Perry*, 460 U.S. at 46. *Cf. Crowder v. Hous. Auth. of City of Atlanta*, 990 F.2d 586, 591 (11th Cir. 1993) ("A nonpublic forum is public property which is not by tradition or designation a forum for public communication, and limits on access to such a forum must meet only a reasonableness standard.") (quotations and alterations omitted).

Here, the relevant forum is the limited portion of the Frank Brown Park Festival Site at which and during the time that Thunder Beach is held. As the City correctly notes, "the scope of the relevant forum is defined by the access sought by the speaker . . . [Courts] must tailor our approach to the perimeters of a forum within the confines of the government property." *Bloedorn*, 631 F.3d at 1232 (citations and quotations omitted).

McMahon argues that the Festival Site, used regularly as a park and for events like children's baseball practice and soccer games, is a traditional public forum, and does not lose its character merely because the City issued a permit to Thunder Beach. The City responds that the exclusive nature of the permit converted the

permitted area into private property, or at least a limited or non-public forum, and that the history and traditional use of the Festival Site shows that it is not a traditional public forum.[9]

1

It is clear from the limited record before this Court that the Frank Brown Park Festival Site, when not used for any event, is a traditional public forum.

In so holding, this Court does not ignore the history of the Site. It understands that the Festival Site was funded and constructed in order to provide "new and attractive venues for year-round special events of all types and sizes." ECF No. 25-1 at 2. It understands that the Festival Site has, in fact, frequently and consistently been used for special events, public and private, free and ticketed. *Id.* at 2-4.

But the nature of the Site when it is not permitted—a publicly accessible open field used regularly for recreational activities like soccer and children's baseball practice—is that of a traditional public forum; it is of the type of fora that have "immemorially been

---

[9] As explained below, the City's argument that the permit temporarily converted public property into private property is not well taken. *See* Part III.A.3.

held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (citations and quotations omitted). That is not necessarily to say that the City "designated" the forum for such a use, an act that requires intent. *See Bloedorn*, 631 F.3d at 1231. But it is to say that the City cannot build a park—the most quintessential traditional public forum—allow people to use it as a park, and then rely on some "whereas" clauses in a development agreement to say that it's not really a park.

In making this determination, this Court looks beyond the "physical characteristics" of the property and instead looks "to the traditional uses made of the property, the government's intent and policy concerning the usage, and the presence of any special characteristics." *Id.* at 1233. Here, despite the City's expressed desire to hold the area as a limited forum for permitted events, the record shows that the public has traditionally made use of the property (when not permitted for an event) as a park, that the City intends this to occur and actively sends Parks Department employees to monitor the park, and that the area has the "special characteristic" of looking a whole lot like the most cherished and quintessential

public forum—a public park. *See United States v. Grace*, 461 U.S. 171, 177 (1983) ("[P]ublic places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and *parks*, are considered, without more, to be public forums.") (citations and quotations omitted, and emphasis added); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981) (distinguishing a limited forum from a public one that is "a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment"); *Frisby v. Schultz*, 487 U.S. 474, 480–81, (1988) ("[O]ur decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a 'cliché,' but recognition that [w]herever the title of streets and *parks* may rest, they have immemorially been held in trust for the use of the public.") (citations and quotations omitted, and emphasis added); *United States v. Kokinda*, 497 U.S. 720, 743 (1990) (Brennan, J., dissenting) ("Public parks, streets, and sidewalks are public forums because open access by all members of the public is integral to their function as central gathering places and arteries of transportation. Public access is not a matter of grace by government officials but rather is inherent in the open nature of the locations. As a result, expressive activity is compatible with the normal

use of a public forum."); *Naturist Soc., Inc. v. Fillyaw*, 958 F.2d 1515, 1522–1523 (11th Cir. 1992) (finding a beach to be sufficiently similar to a park to be a traditional public forum and noting that courts "have consistently held that parks are public forums"). *Cf. Kokinda*, 497 U.S. at 727 (majority opinion) (finding service sidewalk was not traditional public forum because it was "constructed *solely* to provide for the passage of individuals engaged in postal business") (emphasis added); *Powell v. Noble*, 798 F.3d 690, 700 (8th Cir. 2015) (finding that paved sidewalks outside of fairgrounds were not traditional fora during the time when the state fair was held because, unlike sidewalks that are traditional public fora, they were not "open, unrestricted thoroughfares for general public passage but rather are situated near entrance gates on the fairgrounds and serve as a congested conduit for ingress and egress").

If it looks like a duck, walks like a duck, and quacks like a duck, chances are it's a duck. The Festival Site looks, walks, and quacks like a park, so it's a park.

2

Other than the word "exclusive" in the permit agreement, there is nothing in the limited record before the Court to distinguish Thunder Beach from any other gathering held on the public forum on which is sits.

Thunder Beach contains no barricades, barriers, or attendants meaningfully limiting egress and ingress. It contains no signs conveying a message to the effect of "private event—no trespassing." Any person can choose to walk in to the event just as one could choose to walk to the same location on a given weekend when an event is not being held.

In analyzing the forum, this Court looks not just to the language of the permit agreement, but objectively to the property's "nature," "use," "characteristics," "purpose," and "function." *Bloedorn*, 631 F.3d at 1233–1234; *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998) ("Traditional public fora are defined by the objective characteristics of the property."); *United States v. Frandsen*, 212 F.3d 1231, 1237 (11th Cir. 2000) ("The nature of the property determines the level of constitutional scrutiny applied to the restrictions on expression."). Although the City is correct that the Government's intent may be a factor to be

considered, *see Bloedorn*, 631 F.3d at 1233, it is only one factor, and it is not dispositive. *See Bowman v. White*, 444 F.3d 967, 978 & n. 6 (8th Cir. 2006). *Accord Grace*, 461 U.S. at 180.[10]

Thunder Beach, like the park beneath it, looks, walks, and quacks like a traditional public forum. It doesn't quack any differently because the permit agreement says "exclusive."

Thunder Beach is a thus a fundamentally different kind of event than an exclusive, ticketed event held on the same location like the Gulf Coast Jam. One does not simply walk into Gulf Coast Jam; if a person doesn't present a ticket to a security official at a marked entrance point, they won't get in. The Festival Site during such events, given its use, purpose, and function, is likely a limited public forum.

The problem with the City's argument is that it relies too much on the language of the permit agreement between it and Thunder Beach. The City cannot simply write off the nature of a forum by slapping magic words like "exclusive" into a permit agreement. A Government "may not by its own *ipse dixit* destroy

---

[10] It is somewhat unclear if the *Bloedorn* court's admonition to consider government intent is applicable in analyzing a traditional public forum, or only a designated public forum. *Cf. Forbes*, 523 U.S. at 678 ("[T]raditional public fora are open for expressive activity regardless of the government's intent.").

the 'public forum' status of streets and parks which have histori-
cally been public forums." *Grace*, 461 U.S. at 180 (citations and
quotations omitted) (holding that Congress could not, by statute,
destroy the public forum status of the sidewalk abutting the Su-
preme Court building).

The City cites no authority directly supporting its argument
that a government that issues an "exclusive" permit automatically
converts an area that is otherwise a traditional public forum into
something else. Instead, it cites only cases in which courts have
found that traditional public fora *retain* their character during pri-
vate events held on public property under non-exclusive permits.
*See, e.g., Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d
1094, 1098–1099 (8th Cir. 2013); *Teesdale v. City of Chicago*, 690
F.3d 829, 830 (7th Cir. 2012); *Startzell v. City of Philadelphia,
Pennsylvania*, 533 F.3d 183, 190 (3d Cir. 2008); *Gathright v. City
of Portland, Or.*, 439 F.3d 573, 576 (9th Cir. 2006); *Parks v. City of
Columbus*, 395 F.3d 643, 645 (6th Cir. 2005); *Jankowski v. City of
Duluth*, No. CIV. 11-3392, 2011 WL 7656906, at *4 (D. Minn. Dec.
20, 2011).

The courts in most of those cases at some point noted the
non-exclusive nature of the permitting scheme, but all seemed

more motivated by the *nature and character of the event* than the authority granted under the permit scheme. *See, e.g., Parks*, 395 F.3d at 648–649 ("[T]o determine whether a public place constitutes a traditional public forum, we must look to the purpose of the forum . . . [U]se of a forum . . . is often regarded as a key factor in determining public forum status.") (citations and quotations omitted); *Starzell*, 533 F.3d at 194 (characterizing question as whether speech could be restricted in "a private-sponsored event in a public forum that was free and open to the general public"); *Gathright*, 439 F.3d at 579 (distinguishing another case on grounds that event "was not open to the public").

Indeed, this case is closely analogous to the Sixth Circuit's decision in *Parks*. There, the City of Columbus issued a permit to a private entity to conduct an arts festival on the public streets. *Parks*, 395 F.3d at 645. The court of appeals, reversing the district court's contrary finding, found that the public streets "remained a traditional public forum notwithstanding the special permit that was issued." *Id.* at 652. There, unlike here, the City's permit was for non-exclusive use and required that the event be free and open to the public. *Id.* at 645. But Thunder Beach, like the Columbus Arts Festival, is *in fact* free and open to the public. In reaching its

decision, the *Parks* court analyzed the nature of the *forum*, not just the nature the permit, and even noted that it was *not* concluding that the plaintiff's "First Amendment rights would vanish if the permit authorized exclusive use." *Id.* at 652 n. 8.[11]

The City argues that that its permit scheme is not mere *ipse dixit*, and that because it took action in addition to expressed intent to change, it was able to modify the nature of the public forum. It even provided (without citation to specific authority) a nifty little formula for determining the nature of a forum: "Expressed Intent + Government Action = Non/public Forum." ECF No. 26 at 38. Even assuming that its proposed formula is correct, the "Government Action" here is wholly insufficient to rise above the level of *ipse dixit*. The City's "action"—inserting the word "exclusive" into its boilerplate contract agreement for permitting the site—did not involve any more meaningful or significant action than the entire Congress mustering together and whipping up enough votes to pass a law effectively declaring the sidewalk around the Supreme

---

[11] The court insinuated that, in such a case, the private entity might be liable if it attempted to suppress speech. *Parks*, 395 F.3d at 652 n. 8. Here, the claim is not that Thunder Beach suppressed speech, but rather that the City's actions on behalf of Thunder Beach suppressed speech. *See* Part III.B at n. 24. The *Parks* court's caution that "First Amendment rights would [not] vanish if the permit authorized exclusive use," 395 F.3d at 652 n. 8, is thus equally applicable here.

Court building to be a nonpublic forum. *See Grace*, 461 U.S. at 180 (declaring such action mere "*ipse dixit*").

Another district court likewise rejected the argument that it is the nature of the permitting scheme, rather than the event itself, that determines that nature of the forum. In *Jankowski*, a case strikingly similar to this one, individuals sought to engage in religious expression at a private event held in a public park. *Jankowski*, 2011 WL 7656906 at *1. The Court found the park to retain its character as a traditional public forum during the private event, and granted the plaintiffs' request for a preliminary injunction. *Id.* at *4–8, 9. The magistrate judge in the case did determine that, despite the City's arguments to the contrary, "[t]he record before the Court does not support a holding that the City has given the non-profit exclusive use and control of the Bayfront Festival Park. *Jankowski v. City of Duluth*, No. 11-CV-3392 MJD/LIB, 2011 WL 7656905, at *5 (D. Minn. Dec. 13, 2011), *report and recommendation adopted*, 2011 WL 7656906. After the preliminary injunction issued, the City moved to modify the injunction after it renegotiated the event contract and included, among other things, an exclusivity provision. *Jankowski v. City of Duluth*, No. CIV. 11-3392 MJD/LIB, 2012 WL 6044414, at *2 (D. Minn. Dec. 5, 2012). The

district judge, however, rejected the City's argument. The court was unpersuaded that the permit's language controlled, and instead noted that "the Court must look to the objective use and purpose of the forum to determine the nature of such forum." *Id.* at *3. The judge thus determined that the change in language of the contract was mere *ipse dixit*, and held that the park retained its public character *despite* the "exclusive use" provision in the permitting scheme because the park was a traditional public forum and the event was free and open to the public. *Id.* at *3–4.

This Court therefore finds that the free and open-to-the-public Thunder Beach event, held on the grounds of the Festival Site, a public park, is a traditional public forum.

3

This is *not* to say that a City may never temporarily alter the nature of a traditional public forum. McMahon conceded as much at oral argument. And it is certainly not to say that public property may not be used, temporarily or permanently, for a more limited purpose. "[I]f the ability to exclude others from public property during the course of a limited, permitted use were found to be a constitutional violation, every picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to

38

constitutional scrutiny." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) (citations, quotations, and alterations omitted). The City could own a wedding pavilion, or a historical firehouse used for intimate gatherings, or a fenced-off parcel of land, and no reasonable person would mistake it for a public forum. If it doesn't look, walk, or quack like a public forum, it's probably not.

Indeed, the Gulf Coast Jam, regularly held on the *exact same site*, is likely *not* a traditional public forum. It is a limited or nonpublic forum. Unlike Thunder Beach, the Gulf Coast Jam—a secured concert event with ticketed admission—doesn't quack like a traditional public forum. Courts have not hesitated to hold that exclusive, ticketed, or otherwise nonpublic events held on public property are not traditional public fora. *See Powell v. Noble*, 36 F. Supp. 3d 818, 833 (S.D. Iowa 2014), *aff'd and remanded*, 798 F.3d 690 (8th Cir. 2015) ("Several other courts have similarly held that regional, county, and state fairgrounds should be considered limited public fora.") (collecting cases). The City does not cite, nor does this Court find, any case holding that a free, open-to-the-public

event held on a traditional public forum is anything other than a traditional public forum.[12]

On the other hand, numerous courts have held or assumed that traditional public fora do retain their character when they host a free and open-to-the-public event. *See, e.g.*, *Jankowski*, 2012 WL 6044414 at *4 ("Courts have consistently held that a private event that takes place in a traditional public forum, and is free and open to the public, does not transform the nature of the forum during such event for purposes of analyzing a First Amendment claim."); *Parks*, 395 F.3d at 652 ("The City cannot, however, claim that one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public."); *Startzell*, 533 F.3d at 196 ("The issuance of a permit to use this public forum does not transform its status as a public forum."); *Zalaski v. City of Hartford*, 838 F. Supp. 2d 13, 37 (D. Conn. 2012), *aff'd in part, vacated in part on other grounds, remanded*, 723 F.3d 382 (2d Cir. 2013) ("[T]he Court has not found any legal authority that a permit allowing a private party to stage

---

[12] The City does cite some cases, discussed below, that found no state action when a plaintiff claimed that his or her free speech rights were abridged. Those cases do not undergo a forum analysis or otherwise discern the nature of the relevant forum.

a public event has the effect of destroying the historical public forum status traditionally bestowed on parks and streets."). *See also Teesdale*, 690 F.3d at 834–835; *Johnson*, 729 F.3d at 1098–1099; *Gathright,* 439 F.3d at 576–577; *Bays v. City of Fairborn*, 668 F.3d 814, 820–821 (6th Cir. 2012); *Pledge of Resistance v. We the People 200, Inc.*, 665 F. Supp. 414, 417–418 (E.D. Pa. 1987); *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 899 (9th Cir. 2008).

The City or Thunder Beach *could* have taken steps to designate either the Site or the Thunder Beach event as a more limited forum. For example, the City could have barricaded off the Site and let it lie vacant when it is not used for private events, as are many state fairgrounds. Thunder Beach could have barricaded the event and charged admission. Even if it did not charge admission, and merely roped or otherwise demarcated the event as a purely private event (even to which all members of the public were invited), the event might be a limited forum.

But those aren't the facts. *Facts matter*. It's not about what permit holders *can* do, it's about what they *do* do.

In order to transform a traditional forum into a more limited one, there must be some sort of visible, meaningful distinction setting the event apart from the venue on which it is held. There must

be a change in the "nature," "use," "characteristics," "purpose," or "function" of the forum. *Bloedorn*, 631 F.3d at 1233–34; *Forbes*, 523 U.S. at 677; *Frandsen*, 212 F.3d at 1237.  The limited record in this case, however, contains no evidence of any such distinction; members of the public were free to come and go at the Site during Thunder Beach just as they were on a typical Saturday morning.

Again, Thunder Beach looks, walks, and quacks like a traditional public forum. Unless and until it starts quacking differently, this Court will find it to be a traditional public forum.

And this rule makes sense. Thunder Beach should not be allowed to avail itself of all the benefits of a traditional public forum—a well-known local gathering place with easy access to and from the forum—while accepting none of the costs that come along with it.[13] Similarly, the City should not be able to transform the Festival Site into a nonpublic or limited public forum without incurring some costs. *Cf. First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1131 (10th Cir. 2002) ("We

---

[13] That is not to say that Thunder Beach, a private entity, may not take action to suppress speech. Thunder Beach is not a defendant, and it is not accused of acting with state authority. But it is to say that City law enforcement, at Thunder Beach's behest or otherwise, may not suppress protected speech. *See* Part III.B.

are convinced the City has attempted to change the forum's status without bearing the attendant costs, by retaining the pedestrian easement but eliminating the speech previously permitted on the same property. In effect, the City wants to have its cake and eat it too, but it cannot do so under the First Amendment.").

Such a result may not be palatable for Thunder Beach, as its business model depends on renting out booths to vendors, and it might lose revenue if vendors instead decided to forego renting a booth and instead distributed literature in the public forum.[14] This Court recognizes that some events may not be feasible in a traditional public forum where content-based regulation of speech is generally impermissible. For example, Ford might not want to put on a corporate-sponsored car festival if it could not preclude GM and Chrysler employees from showing up and advocating that their vehicles are superior. Nor might a vegan organization want to put on a vegan food festival knowing that they could not keep a fried chicken restaurant from sending a man dressed in a cow costume to pass out coupons for chicken biscuits during the event. The

---

[14] The record does not contain any information regarding how many, if any, of Thunder Beach's vendors rent booths for the purpose of indiscriminately distributing free literature to a crowd, as McMahon seeks to do without a booth.

solution, though, is not, as the City requests, to allow suppression of speech in the public forum. *See Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 579 (1995) ("Our tradition of free speech commands that a speaker who takes to the [public forum] to express his views . . . should be free from interference by the State based on the content of what he says."); *Gathright*, 439 F.3d at 578 ("[T]he way to oppose offensive speech is by more speech, not censorship, enforced silence or eviction from legitimately occupied public space."). Rather, the permittee must hold the event in some other type of forum—an unremarkable feat that, as explained, can be accomplished on the *very same piece of property*.

This Court emphasizes, however, that even if, by the *nature* and *use* of the site during the event, the public status of the forum were altered, it would become a limited or nonpublic forum. The City's argument that the "exclusive" permit operates like a lease to transform the Site into purely private property, giving the permit holder all the rights and privileges of private property ownership during the term of the permit, *see, e.g.,* ECF No. 26 at 30–31,

is entirely without merit and is not well taken.[15, 16] The City cites

no case to support its novel theory of forum analysis, nor can it.[17]

Rather, a permit to host an event like Thunder Beach could at most

transform the property into a nonpublic forum, still subject to

---

[15] The City states at one point, in a footnote, that "Thunder Beach is indisputably a non-public forum," ECF No. 26 at 30 n. 16, but in the very next sentence states that "the Festival Site . . . is transformed into private property during the term of the lease to [Thunder Beach]." *Id.* at 30. Based on the totality of its memorandum and its statements at oral argument, the City appears to be advancing the latter argument.

[16] The permit agreement, ECF No. 3-10 at 2, which is entitled "Special Event Agreement," grants a "license to use . . . real property," and defines the contracting party as the "Licensee," is clearly a license agreement, not a lease agreement. *See Turner v. Florida State Fair Auth.*, 974 So. 2d 470, 473–474 (Fla. 2d DCA 2008) (describing distinction between lessee and licensee of real property).

Further, even if the City did convey a leasehold interest in the land, that still would not necessarily mean that Thunder Beach was not a public forum. *See Freedom from Religion Found., Inc. v. City of Marshfield, Wis.*, 203 F.3d 487, 494 (7th Cir. 2000) (finding that sale of public forum to private entity did not undermine public nature of forum and that question must be answered by analyzing use, nature, and function of property).

[17] In fairness, although the City did not cite it, the Supreme Court once speculated that there could be public property that is not any sort of forum. *See Forbes*, 523 U.S. 666, 678 (1998) ("Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum or not a forum at all."). However, this elusive "non-forum" seems to have fallen into obscurity in First Amendment jurisprudence, and this Court finds no authority defining its contours in any meaningful way. Regardless, even if such a thing exists, Thunder Beach is certainly not one.

viewpoint neutrality and reasonableness restrictions on regulation of speech.[18]

## B

The City argues that, regardless of the nature of the forum, there was no state action, so it cannot be liable under 42 U.S.C. § 1983. It argues that it did not have anything to do with the decision prevent McMahon from leafletting, and that it was just neutrally enforcing trespass laws on behalf of Thunder Beach, the valid permit holder.

In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law. *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). Although many courts address the issue of state action before determining the relevant forum, *see, e.g., Rundus v. City of Dallas, Tex.*, 634 F.3d 309, 315

---

[18] This Court declines to speculate about the extent to which a *purely* private event, such as a family reunion or wedding, might be subject to viewpoint-neutrality and reasonableness limitations inasmuch as it is a nonpublic forum, or whether such an event would fall outside typical forum analysis. This Court is satisfied that any event to which all members of the public are invited, whether free or by widely available ticketed entry, is at least a nonpublic forum. *Cf. Powell*, 36 F. Supp. 3d at 833 ("[R]egional, county, and state fairgrounds should be considered limited public fora.").

(5th Cir. 2011), there is no requirement that the issue of state action must be divorced the determination of the forum. *See, e.g, Parks*, 395 F.3d at 652 (addressing whether state action occurred after determining that the event in question was a traditional public forum).

Here, the City engaged in state action. First, Officer Boyer stated that he would arrest McMahon for trespassing if asked to do so by Thunder Beach. Second, the City, acting through City Manager Gisbert, sought advice from legal counsel and, after reflection, stated that the City would enforce Thunder Beach's rights against McMahon if he attempted to leaflet.[19] Such action, taken together with Thunder Beach's statements that they would call the police if he refused to stop distributing literature,[20] amounted to a credible threat that if McMahon did not cease distributing Gospel tracts at Thunder Beach, he would be arrested for trespass. Finally, the City's threatened enforcement would be undertaken pursuant to a policy it created—a policy of unquestioningly enforcing permittees' speech restrictions. The City's threats thus resulted in

---

[19] *See* n. 6; Part III.C.2.

[20] *See* n. 5.

state action sufficient to chill McMahon's distribution of literature at Thunder Beach. *See Harrell v. The Florida Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) ("[I]t is well-established that an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.") (citations and quotations omitted); *Parks*, 395 F.3d at 652 ("[W]hile [the officer] did not actually arrest Parks (because Parks complied with his order), he nevertheless threatened arrest. We believe that all of these factors combined create the presumption of state action.").

The City argues that it was not promulgating the speech-chilling policies or making the decision to remove McMahon from the event, it was merely offering "neutral assistance" in the form of enforcing trespassing laws on behalf of the permit holder, who, like any other property owner, had the right to exclude anyone from its property. *See, e.g., Rundus*, 634 F.3d at 314 ("During the Fair, Dallas police enforce only criminal statutes and ordinances that provide "neutral assistance."). The problem with the cases on which the City relies, however, is that in each of those cases the court presupposed that the permit holder did, in fact, have the right to exclude individuals from the event site. Here, by contrast,

the event site was a traditional public forum—it was a public event to which McMahon, like every other member of the public, was invited, and at which he had the right not to be arrested absent the commission of some crime. Under the circumstances, the "exclusive" permit did not extend so far as to allow to Thunder Beach to revoke permission to enter to anyone for any reason, especially when those reasons carry constitutional implications. *See Childress v. Walker*, 943 F. Supp. 2d 1332, 1348 (M.D. Ala. 2013), *aff'd*, 554 F. App'x 834 (11th Cir. 2014) ("[A] permit does not give its holder the unfettered ability to exclude those who are engaged in protected speech at a public event that is being held in a public forum, and does not give a police officer probable cause to arrest those individuals when none otherwise exists.").[21]

Additionally, in this case—and unlike in many of the cases that the City cites—the City was fully aware of McMahon's intentions to exercise his right to free speech and Thunder Beach's in-

---

[21] The City conceded that, absent authority stemming from the permit, Thunder Beach would have "no power or authority to exclude members of the public who wish to use the property for lawful purposes." ECF No. 26 at 33. However, the "exclusive" permit did not confer in Thunder Beach as much authority as the City suggests. *See* Part III.A.3.

tentions to evict him based on his exercise of protected speech. Under these circumstances, the City cannot stick its head in the sand and claim that it is merely neutrally enforcing the trespass statute on behalf of the permit holder. It knew that McMahon had the right to engage in free speech at Thunder Beach (or at least, should have known; the City Attorney incorrectly determined that the event was a nonpublic forum),[22] and still chose to act in a way that would chill his speech. Courts have noted that state action may exist where a government enforces a trespass statute on behalf of a private actor when it knows that the private actor has excluded the individual for an unconstitutional reason. *See, e.g., Lavoie v. Bigwood*, 457 F.2d 7, 11–12 (1st Cir. 1972) ("[T]he state would retain a neutral posture *unless it was necessarily apprised* of the landlord's purpose to violate rights of free speech and association.") (emphasis added); *Heart of Atlanta Motel, Inc. v. United States*,

---

[22] In fairness to the City Attorney, her memorandum relied on the assumption, contradicted by the record in this case, that the Festival Site "generally lie[s] vacant and unused when not rented for exclusive use." ECF No. 3-6. Additionally, the City Attorney concluded that "[i]n those areas where the venue permit holder has requested the right to prohibit the distribution of pamphlets in order to avoid disruption of his event, we believe caselaw recognizes his right to do so in the area the venue permit holder has reserved exclusively for his event." *Id.* This conclusion is much narrower than the position actually adopted by the City—namely, that the permit holder has the same unfettered discretion to suppress speech as does a private property owner.

379 U.S. 241, 280 (1964) (Douglas, J., concurring) (noting that state enforcement of trespass law based on property owner's discrimination was state action); *Bell v. State of Md.*, 378 U.S. 226, 311 (1964) (Goldberg, J., concurring) ("A State, obligated under the Fourteenth Amendment to maintain a system of law in which Negroes are not denied protection in their claim to be treated as equal members of the community, may not use its criminal trespass laws to frustrate the constitutionally granted right. Nor, it should be added, may a State frustrate this right by legitimating a proprietor's attempt at self-help.").

Many of the cases on which the City relies are further distinguishable. Several addressed only the question of whether the private actor's conduct amounted to state action, and did not address whether the government's conduct in threatening and enforcing the arrest amounted to state action. *See, e.g, Rundus*, 634

F.3d at 315 ("We hold that the facts here clearly indicate [the private actor] is not a state actor.");[23] *Reinhart v. City of Brookings*, 84 F.3d 1071, 1073–1074 (8th Cir. 1996) (addressing only the private entity's rules and not the extent to which the City enforced them); *United Auto Workers, Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 908 (4th Cir. 1995) (assessing question of private entity liability because only private entity was named as defendant); *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000) (addressing question whether "the district court erred when it ruled that Memphis in May, despite its status as a private corporation, operated as a state actor in ejecting Lansing from the area

---

[23] The *Rundus* court did note, somewhat in passing, that the city's enforcement of criminal statutes to provide "neutral assistance" did not implicate state action. 634 F.3d at 314. However, the court never specifically addressed the extent to which the *city's* conduct was state action. Instead, it consistently framed the question at issue as "whether SFOT [the private entity] is a state actor," *id.* at 313 n. 5. Indeed, it cited caselaw standing for the proposition that "neutral assistance" by police may in some circumstances evidence state action *by the private actor* that seeks enforcement. *Id.* at 314 n. 6 (citing *White v. Scrivner Corp.,* 594 F.2d 140, 143 (5th Cir. 1979)). The court also distinguished *Parks* on the ground that that there "the city aided the private event organizers in enforcing their speech restrictive regulations" and also noted that in *Parks* "the event organizers *held a permit*; and were not the city's tenants; as such, they did not hold the same legal rights that a private tenant like SFOT does."). *Rundus*, 634 F.3d at 314 (citations omitted) (emphasis added). *Cf. id.* n. 15.

between the barricades."). Here, there is no contention that Thunder Beach is a state actor.[24] Nor is there any suggestion that the City should be liable for Thunder Beach's actions or policies. McMahon only alleges that the City, through its own actions in enforcing the trespass statute, acted under the color of state authority.

Additionally, the City relies on *Southwest Community Resources, Inc. v. Simon Property Group, LP*, 108 F. Supp. 2d 1239, 1245–1246 (D.N.M. 2000), but that case concerned literature distribution at privately-owned shopping malls, which are fundamentally different from the publicly-owned traditional public forum that is the Festival Site.[25]

---

[24] Private actors may, in certain circumstances, be found to be acting as a public actor and subject to liability under § 1983. *See, e.g., Watchtower Bible & Tract Soc'y of New York, Inc. v. Sagardia De Jesus*, 634 F.3d 3, 10 (1st Cir. 2011) ("[T]he 'state actor' label can apply where the nominally private actor is performing an inherently public function, where the nominally private conduct is inextricably entangled with official public action, or where the nominally private conduct is compelled by state law or state actors."); *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 454 (6th Cir. 2004).

[25] Elsewhere, the City relies on *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972). *Lloyd*, which also involved a private shopping facility, is inapposite for the same reasons as *Southwest Community Resources*.

The strongest case that the City cites (although only in passing) in support of its argument is *Villegas*, in which the Ninth Circuit found that a city was not liable under § 1983 for enforcing violations of a private entity's dress code during its festival. 541 F.3d at 957. There, however, although the court did not engage in a forum analysis, the event was clearly a limited public forum in which the permit holder would have had the right to promulgate a viewpoint-neutral, reasonable dress code. *See Goodhue v. Cty. of Maui*, 98 F. Supp. 3d 1133, 1141 (D. Haw. 2015) (noting that *Villegas* involved a limited public forum).  Such a forum is fundamentally different from the traditional public forum where Thunder Beach is held, and so the *Villegas* court correctly found in its very cursory discussion of the issue that no constitutional violation occurred in enforcing the (presumably) viewpoint-neutral, reasonable dress code.

Instead, courts facing similar facts to this case—namely, a government threatening to enforce trespass ordinances during an event held on a traditional public forum—have not questioned state action. *See, e.g.*, *Johnson*, 729 F.3d at 1097 (assuming state action where police officer arrested individual for trespass after refusing to leave); *Gathright*, 439 F.3d at 574 (assuming state action

where "police officers forced Gathright to leave the open events he attended by threatening him with arrest for trespass"). This is even more apparent when the government is involved at both the "back end" and "front end"—that is, when the government has a policy which gives unfettered discretion to a private permit holder to choose who may speak, and then chooses or threatens to enforce that entity's exercise of discretion. *See Parks*, 395 F.3d at 653 ("[T]he City and its agents supported the permitting scheme that ostensibly provided a permit-holder with unfettered discretion to exclude someone exercising his constitutionally protected rights from a public street . . . Parks received a letter from the City Attorney defending the actions of the permit holder."); *Jankowski*, 2011 WL 7656906 at *4 ("As is clear from the email and letter sent to Plaintiffs by the Office of the City Attorney, the City has taken the position that the non-profit had exclusive use of the Park and could therefore exclude persons if it chose to do so. By taking this position, it appears that the City has adopted a policy which implicates their First Amendment rights."). While the permit holder, Thunder Beach, may be able to make its own rules, the City has given Thunder Beach free rein to set those rules and ultimately provides the muscle to enforce them.

This Court therefore finds that the City's conduct in allowing Thunder Beach unfettered discretion to limit speech and in enforcing Thunder Beach's attempted exercise of that discretion on McMahon's leafletting activities amounts to state action.

## C

Having determined that the Festival Site during Thunder Beach is a traditional public forum, and that the City's conduct amounts to state action, this Court must next determine whether the imposed restriction—a total ban on McMahon's leafletting stemming from complete deference to Thunder Beach's decision regarding what speech may be allowed at the event—passes constitutional muster. A time, place, and manner restriction can be placed on a traditional public forum if it is content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication. *Bloedorn*, 631 F.3d at 1231. A content-based restriction must survive strict scrutiny; that is, the government must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Perry*, 460 U.S. at 45. *Accord Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1331 (M.D. Fla. 2011).

This Court finds that the City's prohibition on McMahon's leafletting activities at Thunder Beach is not a reasonable time, place, and manner restriction. McMahon is therefore likely to succeed on the merits of his First Amendment claim.

1

The City argues that its policy of "renting out its facility to private parties for their exclusive use, *and even its deference to those Lessees to make their own rules*," ECF No. 26 at 41 (emphasis in original), is content neutral, narrowly tailored, and leaves open ample alternative means of communication.

However, even assuming that such a policy is content neutral, it is by no means narrowly tailored to achieve a significant government interest. The Ninth Circuit squarely found as much when analyzing a similar city policy in *Gathright*. The court held that "the policy of allowing permittees *unfettered discretion to exclude private citizens on any (or no) basis* is not narrowly tailored to the City's legitimate interest in protecting its permittees' right[s]." *Gathright*, 439 F.3d at 577 (emphasis added). *See also Childress*, 943 F. Supp. 2d at 1348 ("[A] permit does not give its holder the unfettered ability to exclude those who are engaged in

57

protected speech at a public event that is being held in a public forum.").

Similarly, the Sixth Circuit rejected an attempt to stop leafletting where, like here, "[t]he City . . . consistently maintained that the actions were not its own but rather that of the permit holder." *Parks*, 395 F.3d at 654. The court was troubled by the fact that "the City and its agents supported the permitting scheme that ostensibly provided a permit-holder with unfettered discretion to exclude someone exercising his constitutionally protected rights from a public [forum]." *Id.* at 653. The court found that the "the City has not offered an interest, let alone a compelling one, to explain why it prohibited [Plaintiff] from exercising his First Amendment rights in a traditional public forum." *Id.* at 654. *See also Jankowski*, 2011 WL 7656905 at *11 (noting that the city had not "provided any governmental interests to explain why it prohibited [Plaintiff] from exercising his First Amendment rights in a traditional public forum.") (quotations omitted).

Further, courts have shown skepticism that total-deference policies like the one advanced by the City can even be content neutral. *See Parks*, 395 F.3d at 654 ("[W]e find it difficult to conceive

that Parks's removal was based on something other than the content of his speech."); *Gathright*, 439 F.3d at 577 n. 3 ("The City's assertion that its policy is content neutral is questionable.").

The City claims that its policy is narrowly tailored to the significant interests of controlling the use of its property, freely entering into contracts, collecting money to offset maintenance and usage costs, protecting the comfort and usage of its lessees, and protecting the lessees' business model and contract rights. But the City sidesteps the policy at issue. The City may be correct that its "policy of leasing the Festival Site," ECF No. 26 at 42, is narrowly tailored to those interests. But the policy at issue in this case, the policy that chilled McMahon's speech, is the policy of unquestioningly arresting anyone that the permit holder claims is trespassing, even given full knowledge that the permit holder revoked its permission in response to an otherwise-lawful exercise of free speech. The City has no interest—legitimate, significant, compelling, or otherwise—that is served by such a policy. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (noting that a city has "city has no legitimate interest in enforcing an unconstitutional ordinance"). Moreover, the policy is far

too deferential to the caprice and fancy of the permit holder to be narrowly tailored to anything.

The City's stated policy of unquestioning deference to the whims of the permit holder in enforcing trespass statutes at a free and open-to-the-public event is, to put it gently, troubling. The traditional public forum is the most "quintessential," the most sacrosanct place for citizens to "assembl[e]," "communicat[e] thoughts," and "discuss[] public questions." *Perry*, 460 U.S. at 45 (citations and quotations omitted). It is a place that has "immemorially been held in trust for the use of the public." *Frisby*, 487 U.S. at 481 (citations and quotations omitted). But when a private actor is granted the unlimited discretion to suppress speech, whether based on its viewpoint, content, or anything else, the public forum is eviscerated. It loses its essence. It ceases to be a place dedicated to the *free and open* exchange of ideas.

Indeed, if not Thunder Beach, then where is the public forum? This isn't Philadelphia in the late eighteenth century, where the First Amendment was proposed. It's 2016, and this is the small but sprawling town of Panama City Beach. People don't stroll past vendors and solicitors through the street on the way to work; they drive from their garages in their suburban enclaves to the private

parking lots of their workplaces. People don't go on daily walks through bustling parks abutting their residences; they jog through otherwise empty sidewalks or go to the gym. What people do, as convincingly evidenced by Thunder Beach's own success, is go to attend free and open events held on public property.

Yet the First Amendment's protections of free speech—and its embodied concern for the importance of an open marketplace of ideas—are no less relevant today than in 1789. It is an unusually controversial election year, thought by many to potentially implicate a major realignment of the primary political parties.[26] There is widespread public disagreement over significant issues like racial bias in law enforcement and legal protections for LGBT individuals.[27] The public forum is as important and essential to democracy now as ever.

And yet the City of Panama City Beach seeks to quash the public forum—to destroy the absolute freedom of viewpoint and

---

[26] *See, e.g.*, Robert Robb, *A multiparty system for the United States?*, Ariz. Republic, March 23, 2016 at A24, 2016 WLNR 8940473. *Cf.* Christopher Baylor, *Realignment time?*, San Diego Union-Tribune, March 22, 2016, at 5, 2016 WLNR 8823098.

[27] *See, e.g.*, *Black Lives Matter at St. Patrick's Day Parade,* Providence Journal, April 2, 2016, at 13, 2016 WLNR 1005 9748; Katherine Peralta, *NC LGBT law prompts Lionsgate to pull production of new Hulu show from Charlotte*, Charlotte Observer, April 4, 2016, at 559, 2016 WLNR 10224290.

content that defines the public forum—by delegating the unfettered ability to suppress ideas to a private company and then hiding behind the shield of providing only "neutral assistance" that "applies evenhandedly to all who wish to rent the [forum]." ECF No. 26 at 41. Obviously the City would not have such unfettered discretion to suppress speech at its own event held on the same property.[28] So the question before this Court is whether the City can, by using the magic word "exclusive," transform a public forum into private property in which the permittee has unfettered discretion to harness the power of the state to suppress speech? Can the City do indirectly what it could *clearly* never do directly? For this Court, the answer is no.

This Court therefore finds that McMahon is substantially likely to prevail on his argument that the City's policy of affording unfettered discretion to a permit holder to suppress speech is not,

---

[28] *See Kokinda*, 497 U.S. at 725 ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business.").

on its face or as applied, narrowly tailored to serve any governmental interest, and thus amounts to a violation of his First Amendment rights.[29]

2

The City, both in its memorandum and at oral argument, maintained that its policy was to unquestioningly defer to the whims of the permit holder in enforcing trespass violations against any speakers that the holder found objectionable. *See, e.g.*, ECF No. 26 at 41 ("The only factor relevant to the City's enforcement of [Florida's trespass statute] is whether the party requesting removal from the premises has the authority to do so. No consideration is given to the reason the entity desires removal.").

Nonetheless, the City presented some evidence that Thunder Beach's policy and practice was to ban any literature distribution, regardless of content, by anyone who did not pay to rent a booth. *See* ECF No. 25-4; 25-5; 25-6. Indeed, the City Attorney's response to McMahon did not so much defend blanket deference to

---

[29] Because this Court is satisfied that the City's policy is not narrowly tailored to a significant government interest, it need not decide whether it leaves open ample alternative channels of communication.

the permit holder as it did the ability of the permit holder to re-strict all literature distribution in certain limited areas of the event. *See* ECF No. 3-6 ("In those areas where the venue permit holder has requested the right to prohibit the distribution of pam-phlets in order to avoid disruption of his event, we believe caselaw recognizes his right to do so in the area the venue permit holder has reserved exclusively for his event.").

Courts have allowed content-neutral bans on innocuous ex-pressive activity in limited public fora where traffic and congestion concerns are an issue. *See, e.g., Powell*, 798 F.3d at 701; *Heffron*, 452 U.S. at 655.[30] Even in traditional public fora, courts have not uniformly agreed that such distribution must be protected at all places at all times. *Compare Johnson*, 729 F.3d at 1099–1102 (find-ing ban on literature distribution not narrowly tailored to serve a

---

[30] The *Heffron* Court specifically noted that the state fair at issue was a "limited public forum," 452 U.S. at 655, but performed a "time, place, and man-ner" analysis more typically used with public forums. Regardless, *Heffron* is distinguishable from this case because there, unlike here, the government was enforcing a written, content-neutral rule "not open to the kind of arbitrary ap-plication . . . condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Id.* at 649; *see also Gath-right*, 439 F.3d at 577 ("the policy of allowing permittees unfettered discretion to exclude private citizens on any (or no) basis is not narrowly tailored to the City's legitimate interest in protecting its permittees' right"). And there, unlike here, the plaintiffs sought to solicit funds as well as to distribute literature. *See* Part V.

significant governmental interest), *with id.* at 1102 (Bye, J., dissenting) (finding ban on literature distribution narrowly tailored to significant government interest in maintaining orderly flow of people, promoting access for security and emergency vehicles, and facilitating activities).

This Court need not consider, however, whether the allegedly content-neutral ban on literature distribution that Thunder Beach claims it was enforcing would pass constitutional muster. The record does not suggest that the City was enforcing such a policy, or even that it was providing "neutral assistance" in order to further enforcement of such a policy. The City insisted, both in its legal argument and through its witnesses, that its decision to enforce trespass violations on Thunder Beach's behalf was *not* about enforcing any anti-literature-distribution policy—content-neutral, narrowly tailored or otherwise—but about Thunder Beach's unfettered discretion, like any holder of private property, to exclude whomever it wants for any reason. *See* ECF No. 25-1 at 4 ("[I]f the promoter requests the City's assistance after having asked that Mr. McMahon leave and he refuses to do so, then it [the City] should direct him to an area of the park for which the pro-

moter does not have exclusive use."); ECF No. 25-2 at 2 ("The Police Department . . . does not get involved in enforcing the rules or regulations for Thunder Beach . . . [it] does not get involved with the event unless we are called to respond because someone is breaking the law or police assistance is otherwise needed."); ECF No. 25-3 at 2 ("I responded that if Thunder Beach asked us (meaning the Police Department) to give him a trespass warning from the property during its event that we could do so. That was based on my understanding that *TBP had the lawful control of the property and the authority to ask someone to leave.*") (emphasis added).[31]

Additionally, there is no evidence that Thunder Beach's purported policy even existed aside from the affidavits submitted as part of this case. Courts have found that that unwritten, informal, unevenly enforced "policies" that in fact afford great discretion to the decisionmaker, even in limited public fora, are want to lead to

---

[31] This Court understands that the City's legal argument alone is probably not enough to establish a "policy" sufficient to subject it to liability under § 1983. *See Teesdale*, 690 F.3d at 835 ("The plaintiffs argue that a legal argument or a litigation position taken by a municipality can, by itself, constitute an official policy. But there is little case law in support of this position."). But the record makes clear that the policy at issue here is not merely a legal argument, but one that the City was actually enforcing.

viewpoint discrimination.[32] *See, e.g.*, *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.*, 653 F.3d 290, 296 (3d Cir. 2011). Viewpoint discrimination is "an egregious form" of content discrimination that courts will not tolerate. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–829 (1995). And a government cannot generally put forth after-the-fact evidence of a purportedly viewpoint-neutral policy, as this could lead to post-hoc rationalizations for viewpoint discrimination. *See Pittsburgh League*, 653 F.3d at 296 ("Because the Port Authority did not mention this basis until after the lawsuit had been filed, the District Court permissibly found that it was not a real basis for rejecting the ad but was, instead, a post hoc rationalization."). *See also City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758, (1988) ("Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making

---

[32] For this reason, McMahon's claim would be likely to succeed on the merits even if Thunder Beach were determined to be a limited or nonpublic forum.

67

it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression."); *Crowder,* 990 F.2d at 591 ("A restriction which vests unlimited discretion in a government actor, however, opens the way to arbitrary suppression of particular points of view. Such arbitrariness is inherently inconsistent with a valid time, place, and manner regulation.") (citations and quotations omitted); *Roman Catholic Found., UW-Madison, Inc. v. Regents of Univ. of Wis. Sys.*, 578 F. Supp. 2d 1121, 1135 n. 10 (W.D. Wis. 2008), *aff'd sub nom. Badger Catholic, Inc. v. Walsh*, 620 F.3d 775 (7th Cir. 2010) ("The University must of course evaluate activities pursuant to clear standards in order to minimize self-censorship and post-hoc rationalizations that serve to mask viewpoint discrimination.").

McMahon argues that the state engaged in viewpoint discrimination by effectuating an unconstitutional "heckler's veto." A heckler's veto generally occurs when the government suppresses speech because of poor audience reaction, especially a reaction so negative that the threat of violence becomes imminent. *See, e.g.*, *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 252 (6th Cir. 2015) (describing heckler's veto as the "lawless reaction of those who hear [the speaker's message]"); *Ctr. for Bio-Ethical Reform,*

*Inc. v. Los Angeles Cty. Sheriff Dep't*, 533 F.3d 780, 787 n. 4 (9th Cir. 2008) ("We use this term ["heckler's veto"] to describe restrictions on speech that stem from listeners' negative reactions to a particular message."). This is not a typical case of a heckler's veto—the City did not allow Thunder Beach officials to "veto" the speech because they were offended by the nature of McMahon's speech.[33] Nonetheless, the City's willfully blind deference implicates the same concerns that make courts loathe to uphold the heckler's veto, namely, "the First Amendment protection against the government effectuating a complaining citizen's viewpoint discrimination." *Frye v. Kansas City Missouri Police Dep't*, 375 F.3d 785, 793 (8th Cir. 2004) (Beam, J., dissenting)

3

At oral argument, the City for the first time raised the argument that if it were prevented from enforcing Thunder Beach's

---

[33] Indeed, there is very little evidence that Thunder Beach acted with the intent to discriminate against McMahon's Christian viewpoint. Rather, many Thunder Beach officials and employees were themselves Christians and held on-site Christian religious services, and Thunder Beach regularly rented booths to Christian organizations. ECF No. 25-4 at 4-5; 25-5 at 1; 25-6 at 1-2. McMahon's vague statements that promoters from bars and night clubs were passing out fliers at Thunder Beach are not sufficient to establish, at this stage in the litigation, that Thunder Beach was targeting his speech based on his viewpoint.

ability to exclude McMahon, it would infringe on Thunder Beach's own rights to free speech. Although it did not cite any authority, the argument appears to be based on *Hurley*, in which the Supreme Court held that it would infringe a private organization's free speech rights to force it to include in its parade floats espousing viewpoints with which it disagreed. 515 U.S. at 581. Here, unlike entering a float in an organization's parade, McMahon's leafletting could not be reasonably perceived by anyone to reflect the views of Thunder Beach, and his conduct has no impact on Thunder Beach's free speech rights. Numerous courts to consider similar arguments have roundly rejected them. *See, e.g.*, *Gathright*, 439 F.3d at 578 ("*Hurley* does not, by its own terms, extend to these circumstances, where a speaker in a public forum seeks only to be heard, not to have his speech included or possibly confused with another's, and has not violated a valid statute or ordinance."); *Startzell*, 533 F.3d at 195 ("There is no basis to read *Hurley* as circumscribing the long line of authority upholding free access by the general public to street festivals and other events held in traditional public fora."); *Teesdale*, 690 F.3d at 834 (describing such an argument as "misguided" and "regrettable").

IV

"[P]laintiffs seeking preliminary [injunctive] relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). Moreover, it is not all future injuries that matter, but only those that would occur "before a decision on the merits can be rendered." *Id.* (quoting 11A Charles A. Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)).

Irreparable harm is easily, though not automatically, satisfied in cases where a plaintiff would otherwise be prevented from exercising his constitutional right to free speech. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor,* 458 F.3d at 1271–72 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, the City's statements that it would arrest McMahon for trespass if he continued to exercise his First Amendment Rights at Thunder Beach evidence a "direct penalization, as opposed to incidental inhibition[,] of First Amendment rights and thus could not be remedied absent an injunction." *Id.* at 1272 (citations and quotations omitted).

McMahon has stated that he wishes to exercise his First Amendment rights at Thunder Beach in April 2016—just weeks from the date of this Order. Absent an injunction, the City has stated that it will arrest him if he does so. It is hard to imagine a more textbook case of purposeful, imminent, direct penalization.

The City's argument that, given that he waited eight months from the date of the last denial to file suit, McMahon has not shown "imminen[ce]," *see Siegel*, 234 F.3d at 1176 ("[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent.") (citations and quotations omitted), is not well taken. Even assuming that delay may evidence a lack of imminence, given the fixed, infrequent schedule on which Thunder Beach is held, McMahon's "delay" was entirely reasonable.

## V

McMahon bears the burden of showing "that the threatened injury to [him] outweighs whatever damage the injunction may cause to" [the City]. *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001). Likewise, a preliminary injunction may not issue unless a movant shows that the "injunction is in the public interest." *Winter*, 555 U.S. at 20.  When the state is a

party, these considerations are largely the same. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).

"[E]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury" to a plaintiff, *KH Outdoor*, 458 F.3d at 1272, whereas the City "has no legitimate interest in enforcing an unconstitutional" restriction. *Id.* Likewise, "it is always in the public interest to protect First Amendment liberties." *Id.* (citations and quotations omitted).

The City argues that the economic interests of the City in being able to profitably lease the land in a way that pleases permittees such as Thunder Beach, and the interest of Thunder Beach in providing value for the fees that its vendors give it, outweigh McMahon's interest in exercising his First Amendment rights. This Court rejects this argument, and notes that the cases on which the City relies are inapposite given that this Court has determined that McMahon is likely to succeed on the merits of his First Amendment claims. In each of those cases, the court addressed the balance of hardships only after finding that the First Amendment claim was unlikely to succeed. *See Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986) ("Absent a First Amendment claim, the appellants have failed to establish that irreparable

73

harm will flow from a failure to preliminarily enjoin defendants' actions. Nor does the balance of hardships tip in their favor."); *Am. Civil Liberties Union of Nevada v. City of Las Vegas*, 13 F. Supp. 2d 1064, 1082 (D. Nev. 1998) ("[P]laintiffs have *not* shown that they would likely succeed on the merits of their challenge . . . Thus, in order for a preliminary injunction to issue against the enforcement of that ordinance, plaintiffs must demonstrate that the balance of hardships tips sharply in their favor. Plaintiffs have not met this requirement.") (citations omitted); *Chad v. City of Fort Lauderdale, Fla.*, 861 F. Supp. 1057, 1064 (S.D. Fla. 1994) ("[T]he court finds plaintiffs are unlikely to succeed on the merits.").

Additionally, the City appears to overstate the scope of the requested injunction. It argues that "[e]njoining the restriction would allow every exhibitor to sell their goods or solicit causes anywhere on the Festival Site subverting TBP's business model." ECF No. 26 at 57. However, the injunction would not implicate Thunder Beach at all; it would only affect the City's ability to enforce the trespass statute on its behalf. Further, McMahon has not sought to sell any goods or solicit any causes, he has only requested to distribute literature. The Supreme Court has distinguished literature distribution as being a more innocuous, and hence more

protected, form of free speech than solicitation. *See Kokinda*, 497 U.S. at 734 ("One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand, but one must listen, comprehend, decide, and act in order to respond to a solicitation.").

## VI

"[A] court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

Here, the City has not requested any security. Nor does this Court foresee any costs or damages that might be incurred by the City if it is enjoined from arresting McMahon from trespassing if he peacefully distributes literature at Thunder Beach. McMahon therefore need not give any security for his injunction. *Cf. Jankowski*, 2011 WL 7656906, at *9 (waiving security and issuing injunction immediately).

## VII

Richard McMahon wants to pass out literature at Thunder Beach, a free and open-to-the-public event held on a free and open-to-the-public park. Thunder Beach, like the park on which it sits,

75

looks, walks, and quacks like a traditional public forum, a place which has "immemorially been held in trust for the use of the public, and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry*, 460 U.S. at 45 (citations and quotations omitted).

But the City of Panama City Beach argues that factors like the character and use of the property are not controlling. Instead, the City points to a contract—the permit agreement that it drafted between it and Thunder Beach—that accords Thunder Beach "exclusive use" of the park. These magic words, it argues, transform the park into purely private property, wholly outside the reaches of the First Amendment. The permit holder, it claims, is empowered with the nigh-unlimited ability to order the police to forcibly remove and imprison anyone who will not cease speech that does not suit its every fancy.

The City's argument is not well taken. The First Amendment does not yield to magic words, whether "open sesame," "abracadabra," or "exclusive use." Such sorcery cannot accomplish the novel feat of converting public property into private property, and

it cannot allow the City to do indirectly what it could never do itself; namely, allow unfettered discretion to suppress speech in the public forum. This action runs counter to the very purpose of the First Amendment and is precisely the sort of mischief that the Free Speech Clause was meant to address. This Court cannot, will not, and must not allow it.

This Court therefore finds that Plaintiff is substantially likely to succeed on the merits of his free speech claim. His speech is protected, he seeks to speak in a traditional public forum, and the City's policy of total deference to the permit holder—together with its promise to enforce the permit holder's wishes—constitutes state action. The City's policy of affording unfettered discretion to a permit holder to suppress speech is not a reasonable time, place, or manner restriction on Plaintiff's speech. This Court further finds that Plaintiff will be irreparably harmed absent judicial intervention, and that the balance of harms and the public interest favor such intervention. A preliminary injunction must issue.

For the reasons stated,

**IT IS ORDERED:**

1. Plaintiff's Motion for a Preliminary Injunction, ECF No. 3, is **GRANTED**.

2. Defendants are hereby preliminary enjoined from inter-
   fering with or prohibiting Plaintiff and other third party
   speakers from engaging in protected expression in the
   form of peaceful distribution of literature and engage-
   ment in dialogue at the Festival Site of Frank Brown
   Park in Panama City Beach, Florida, during the 2016
   Spring Thunder Beach Motorcycle Rally and all future
   Thunder Beach events.

3. The bond provisions of Rule 65(c) of the Federal Rules of
   Civil Procedure are waived, and this preliminary injunc-
   tion shall issue immediately.

**SO ORDERED on April 12, 2016.**

**s/Mark E. Walker**
**United States District Judge**